**CHECKERS, SIMON & ROSNER, a Partnership, and H.M. Walken Company, Inc., Plaintiffs–Appellants,**

v.

**The LURIE CORPORATION, a California Corporation, Defendants–Appellees.**

No. 87–3081.

United States Court of Appeals, Seventh Circuit.

Argued June 2, 1988.

Decided Dec. 21, 1988.

E. James Gildea, Chicago, Ill., for plaintiffs-appellants.

Peter Petrakis, Katten Muchin & Zavis, Chicago, Ill., for defendants-appellees.

Before POSNER, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Checkers, Simon & Rosner and H.M. Walken Company, Inc., appeal from the district court's order entering summary judgment in favor of Checkers, Simon & Rosner in the amount of $14,593.34 in a diversity action arising out of leases between Checkers, Simon & Rosner and the Lurie Company. We affirm.

## I

Checkers, Simon & Rosner, a partnership whose members all reside in Illinois, and the Lurie Company, a California corporation, entered into four separate lease agreements covering the rental of four separate suites on the same floor of a building Lurie owned at 33 North LaSalle Street in Chicago, Illinois. Each lease ran through April 30, 1986. Three of the four leases (Suites # 1900, 1919 and 1927) provided that "[i]f the terms of any lease, other than this Lease, made by Tenant for any premises in the Building shall be terminated or terminable after the making of this Lease because of any default by Tenant under such other lease, such fact shall empower Landlord, at Landlord's sole option, to terminate this Lease by notice to Tenant." None of the leases contained any additional language conditioning obligations under the leases upon duties contained in any of the other leases.

On or about April 1, 1983, Checkers, Simon & Rosner (CSR) notified Lurie that it had leased alternative office space and would vacate the entire premises in December 1983. CSR vacated on December 1, 1983, but retained the keys to the suites. CSR continued to make the rent payments called for in the lease and were never in default. During the terms of its leases CSR was never made aware of any infringement upon its right to possess any of the space leased from Lurie.

CSR moved to a building owned by H.M. Walken Company, Inc., an Illinois corporation. Pursuant to a September 15, 1983, letter agreement between CSR and Walken, Walken agreed to assume CSR's liability for rent under the leases between CSR and Lurie in exchange for the right to sublet or assign the leases. However, CSR continued to make the rent payments to Lurie. During the remaining term of the leases between CSR and Lurie, CSR and Walken made unsuccessful attempts to secure new tenants for the suites formerly occupied by CSR.

Although the record is not clear as to the specific date of agreement, on either August 9, 1985, or September 19, 1985, Lurie entered into a contract leasing 6,662 square feet of the space formerly occupied by CSR to the law firm of Taylor, Miller, Sprowl, Hoffnagle & Marletti, with the lease commencing on May 1, 1986, immediately following the expiration of the lease agreements between Lurie and CSR. CSR and Walken allege that this lease comprised the area covered in two of CSR's leases (Suites 1900 and 1910) with Lurie and part of the area covered under a third CSR lease with Lurie (Suite 1927). As part of the agreement between Lurie and the Taylor law firm, Lurie agreed to make alterations in the leased premises. These alterations were begun on February 10, 1986, and cost Lurie $151,800. The alterations were made without the knowledge or consent of CSR.

On December 18, 1985, Lurie entered into another lease agreement, this time with Prentice Hall Corporations Systems, Inc., covering 3,980 square feet of the premises subject to CSR's lease for Suite 1927. The Prentice Hall lease was amended in February 1986 to include an additional 867 square feet which had also been part of the same CSR lease, with the amended lease commencing on February 15, 1986, two and one-half months prior to the April 30, 1986, termination date of CSR's lease for the same space. The lease called for a monthly rent of $7,296.67. Lurie received two months' rental payments from Prentice Hall during the months of March and April 1986, for a total rent payment of $14,593.34. However, Lurie did not inform CSR or Walken of its lease agreement with Prentice Hall prior to the termination of CSR's lease on April 30, 1986. Thus, dur-

ing this period Lurie was also receiving rent payments from CSR for the same location. Like the Taylor law firm lease, the Prentice Hall lease called for alterations to the premises, which commenced on February 1, 1986.

CSR and Walken learned of Lurie's leases with the Taylor law firm and with Prentice Hall after the April 30, 1986, expiration of CSR's leases. When Walken gained knowledge of these leases, it requested and received copies of the agreements. Following Walken's receipt of these copies, Lurie's Accounting Manager, Philip E. Elworth, sent a letter, dated June 23, 1986, to Jerry Harris of CSR stating, in pertinent part:

"Review of the accounting records of the leases for the spaces known as 1900, 1910, 1919 and 1927 at the American National Bank Building revealed an error in billing during the last two months of the lease terms expiring on April 30, 1986. The investigation reveals that 3,980 square feet of the space was released to a new tenant effective March 1, 1986. Correspondingly, a credit should have been afforded your firm cancelling this portion of the leases.

"Accordingly, a check totaling $14,182.07 has been enclosed representing two months of the average rent paid on the space during March and April, 1986."

Neither CSR nor Walken has negotiated this check.

The lease agreements between CSR and Lurie provided Lurie with certain rights under the contracts. First, section 19 of the leases for Suites 1900, 1919 and 1927 provided Lurie with a right to remodel the premises for a new tenant during the final portion of the former tenant's occupancy:

"Landlord shall have the following rights, each of which Landlord may exercise without notice to Tenant and without liability to Tenant for damage or injury to property, person or business on account of the exercise thereof, and the exercise of any such rights shall not be deemed to constitute an eviction or dis-

turbance of Tenant's use or possession of the Premises and shall not give rise to any claim for set-off or abatement of rent or any other claim:

\* \* \* \* \* \*

"(d) During the last ninety (90) days of the Term or prior to that time in the event that Tenant vacates or abandons the Premises, to decorate, remodel, repair, alter or otherwise prepare the Premises for reoccupancy." [1]

Second, three of the four leases (Suites 1900, 1919 and 1927) contained a section 21 which included the following language relevant to Lurie's rights upon a tenant's abandonment of the premises:

"All rights and remedies of Landlord herein enumerated shall be cumulative and none shall exclude any other right or remedy allowed by law:

\* \* \* \* \* \*

"(b) If Tenant defaults in the payment of rent, and Tenant does not cure the default within ten (10) days after demand for payment of such rent or if Tenant defaults in the prompt and full performance of any other provision of this Lease and Tenant does not cure the default within twenty (20) days (forthwith if the default involves a hazardous condition) after written demand by Landlord that the default be cured unless the default involves a hazardous condition, which shall be cured forthwith upon Landlord's demand, or if the leasehold interest of Tenant be levied upon under execution or be attached by process of law, or if Tenant makes an assignment for the benefit of creditors, or if a receiver be appointed for any property of Tenant, or if Tenant abandons the Premises, then and in any such event Landlord may, if Landlord so elects but not otherwise, and with or without notice of such election and with or without any demand whatsoever, either forthwith terminate this Lease and Tenant's right to possession of the Premises or, without terminating this Lease,

---

**1.** The remaining lease between CSR and Lurie (Suite 1910) contained language pertaining to the right to remodel which did not materially differ.

forthwith terminate Tenant's right to possession of the premises.

\* \* \* \* \* \*

"(d) If Tenant abandons the Premises or otherwise entitles Landlord so to elect and Landlord elects to terminate Tenant's right to possession only, without terminating the Lease, Landlord may, at Landlord's option enter into the Premises, remove Tenant's signs and other evidence of tenancy, and take and hold possession thereof ... without such entry and possession terminating the Lease or releasing Tenant, in whole or in part, from Tenant's obligation to pay the rent hereunder for the full Term. Upon and after entry into possession without termination of the Lease, Landlord may, but need not, relet the Premises or any part thereof for the account of Tenant to any person, firm or corporation other than Tenant for such rent, for such time and upon such terms as Landlord in Landlord's sole discretion shall determine, and Landlord shall not be required to accept any tenant offered by Tenant or to observe any instructions given by Tenant about such reletting. In any case, Landlord may make repairs, alterations and additions in or to the Premises and redecorate the same to the extent deemed by Landlord necessary or desirable, and Tenant shall, upon demand, pay the cost thereof, together with Landlord's expenses of the reletting. If the consideration collected by Landlord upon any such reletting for Tenant's account is not sufficient to pay monthly the full amount of the rent reserved in this Lease, together with costs of repairs, alterations, additions, redecorating and Landlord's ex-

penses, Tenant shall pay to Landlord the amount of each monthly deficiency upon demand." [2]

Three of the four leases (Suites 1900, 1919 and 1927) also contained provisions stipulating that the leases were to be "governed by and construed pursuant to the laws of the State of Illinois." The lease for Suite 1910 was silent on this point. The leases for Suites 1900, 1919 and 1927 also permitted the tenant to assign or sublease the premises with the landlord's notice and approval. Such consent was not to be unreasonably withheld. However, the lease for Suite 1910 prohibited assignments and subleases.

Lurie's pleadings do not clearly state which sections of the leases Lurie relied upon as authority for its actions. The district court evidently construed Lurie's actions as consistent with Section 21(d) of the leases.[3] However, Lurie's opposition to plaintiffs' motion to amend judgment emphasized reliance upon Section 19 of the leases (allowing remodeling of premises for a new tenant during the final 90 days of a lease) and appears to indicate that Lurie did not specifically utilize section 21(d). In its summary judgment memorandum, Lurie also appeared to admit both that the actual reletting of CSR's space to Prentice Hall (commencing with the effective date of the new lease) constituted the acceptance of a surrender of CSR's lease for the affected suite and that Lurie "did not relet the premises for the account of CSR." Also in this memorandum Lurie argued that all excess rent paid by CSR for the period commencing with Prentice Hall's occupation of the leased premises had been returned to CSR, thus rendering the question

---

**2.** The remaining lease between CSR and Lurie (Suite 1910) contained a section 15 which was generally similar to section 21 of the other leases. It differed from the other leases by substituting the terms Lessor and Lessee for Landlord and Tenant, by requiring, in paragraph (d), payment by the Lessee of the amount of the lease rather than monthly rent payments and by providing, also in paragraph (d), for the lessor to account to the lessee for surplus rent from another tenant. All four leases contained language stating: "The phrase 'if Tenant [or the Lessee] abandons the premises' as used in Paragraph (b) and (d) of Section 21 [or Section 15]

of this Lease shall mean, 'if Tenant [or the Lessee] ceases to occupy, ceases to have possession of, moves from, vacates or abandons the premises.'"

**3.** *See Checkers, Simon & Rosner v. Lurie Company*, No. 87 C 5405, slip op. at 10 (N.D.Ill. October 19, 1987) [1987 WL 18930]. References in our opinion to Section 21 of the leases for Suites 1900, 1919 and 1927 also are to be construed as references to Section 15 of the lease for Suite 1910, unless otherwise noted.

of whether "Lurie was renting for the account of CSR from that time forward ... moot." Finally, at oral argument, Lurie's counsel noted that it was possible that Lurie's rental to Prentice Hall might be considered a surrender of the lease for all of Suite 1927, which, in the worst case, could make Lurie liable for $33,855.92 (two and one half months of CSR's rent for all of Suite 1927).

Initially, CSR's case relies upon the contention that Lurie's execution of leases with the Taylor law firm and Prentice Hall meant that Lurie accepted CSR's surrender of all four leases on the date the successor leases were executed. CSR believes that the magnitude of the remodeling required by the new tenants supports this interpretation. Alternatively, CSR argues that the extent of remodeling meant that Lurie accepted surrender of the CSR leases on the date that remodeling was begun. With respect to each of these contentions, CSR asserts that when Lurie accepted surrender of any one of the CSR leased premises, Lurie in effect accepted the surrender of all the CSR leases.

The district court rejected CSR's positions. The court concluded that Lurie's execution of the leases with the Taylor law firm and Prentice Hall did not cause Lurie to lose "all claim to rent from the current tenant." *Checkers, Simon & Rosner v. Lurie Company,* No. 87 C 5405, slip op. at 5 (N.D.Ill. October 19, 1987). The court noted that: "Any landlord who is a reasonable business person will try to minimize the amount of vacant space and the time that space remains vacant. It is simply good business to sign up future tenants during the tenancy of the present occupants." *Id.* The district court also determined that remodeling of the premises did not constitute a breach of an implied covenant of quiet enjoyment or a constructive eviction, because CSR had vacated and no longer had the necessary possession of the premises.[4] Furthermore, Lurie's remodeling of the space leased to CSR was not

acceptance of CSR's surrender, because the "CSR Leases explicitly provided that Lurie could renovate the Premises during the term of the Leases without terminating CSR's obligation to pay rent." *Checkers, Simon & Rosner,* slip op. at 7. The district court concluded that "CSR's obligation to pay rent did not stop until the Premises were actually occupied by a new tenant and the new tenant began paying rent." *Id.* at 10. Pursuant to Section 21(d) of the leases, the new tenant's rent would be considered to be for CSR's account. Judgment was entered for the two months rent received from Prentice Hall during the term of CSR's lease, an amount ultimately determined to be $14,593.34.[5]

CSR and Walken appeal the district court's decision, urging that they raised genuine issues of material fact concerning the questions of whether Lurie accepted CSR's surrender of all the leases either at the time Lurie executed the Taylor and Prentice Hall leases or at the time Lurie commenced the remodeling called for under those leases. Walken also appeals the district court's determination that Walken was not a real party in interest and should be dismissed from the case.

## II

■ With respect to the question of whether Walken was properly dismissed from the case, we have previously observed:

"Fed.R.Civ.P. 17(a) provides that '[e]very action shall be prosecuted in the name of the real party in interest.' The real party in interest is the one who 'by the substantive law, possesses the right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery.'"

*Illinois v. Life of Mid–America Insurance Co.,* 805 F.2d 763, 764 (7th Cir.1986) (quoting C. Wright, *Law of Federal Courts,* § 70 (4th ed. 1983)).

---

4. CSR and Walken have abandoned these two arguments on appeal.

5. This amount was awarded in a district court order which granted a motion to amend judgment on this issue.

In this case Walken and CSR clearly rely upon CSR's rights under substantive law. There is nothing in the record to even indicate that Walken has ever been substituted for CSR as a party to the lease, and CSR's continued payment of rent to Lurie points to a contrary conclusion. Thus, even though CSR's recovery in this case would likely benefit Walken, which has taken the responsibility of paying CSR's rent under these leases, CSR, rather than Walken, remains the real party in interest. The district court properly dismissed Walken from these proceedings.

### III

In approaching the issue of whether a question of material fact should preclude summary judgment, we have stated:

"A motion for summary judgment should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Illinois v. Bowen,* 808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party must do more than simply 'show that there is some metaphysical doubt as to the material facts.' *Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted). 'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no "genuine issue for trial."' *Id.* at 587, 106 S.Ct. at 1356 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). 'The court should neither "look the other way" to ignore genuine issues of material fact, nor "strain to find" material fact issues where there are none....' *Secretary of Labor v. Lauritzen,* 835 F.2d 1529, 1534 (7th Cir.1987) (quoting *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 498 (7th Cir.1972))."

*Beard v. Whitley County, REMC,* 840 F.2d 405, 409–410 (7th Cir.1988).

In determining whether a genuine issue of material fact is present we must consider both the substantive law applicable to this case and the question of whether a reasonable jury could render a verdict in favor of the nonmoving party based upon this law.[6] In a diversity case we identify the body of substantive law to apply by turning to the conflict of law principles of Illinois, the forum state. *See Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496–497, 61 S.Ct. 1020, 1021–1022, 85 L.Ed. 1477 (1941). Under these principles, Illinois substantive law is applicable. First, the parties have stipulated to the use of Illinois law in three of the four leases, a most reasonable choice when considering the fact that the leases cover real property located in Illinois and involve an Illinois tenant. *See SNACI, s.r.l., v. Illinois Foundation Seeds, Inc.,* 830 F.2d 90, 92 n. 1 (7th Cir.1987) (Illinois case) ("Because the parties agree that Illinois law applies to this case and because that choice of law is reasonable, this court will follow Illinois law"); *Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 n. 2 (7th Cir.1987)

---

**6.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Although CSR was technically granted summary judgment in this case, the district court's decision on the questions of whether surrender and acceptance occurred on the dates

of execution of the new leases or on the dates of commencement of remodeling were adverse to CSR and the equivalent of a grant of summary judgment in favor of Lurie on these issues. Thus, CSR is properly treated as the nonmoving party on these questions.

(Illinois case) ("The parties agree that Illinois law should govern Marmon's breach of contract claim. Because 1) the contract was executed in Illinois, 2) Marmon's principal place of business is in Illinois, and 3) Rexnord is licensed to do business in Illinois, this is a 'reasonable stipulation [ ] of choice of law,' and it will be honored."). Second, "[w]hen (as here) the parties do not say that the forum state's conflict-of-laws rules require the application of another state's substantive law, this means we must apply the forum state's substantive law." *In the Matter of Iowa Railroad,* 840 F.2d 535, 543 (7th Cir.1988). We now turn to the question of whether CSR has presented factual allegations sufficient to raise a genuine issue of material fact under the Illinois law applicable to business leases.

**A**

■ CSR's claims regarding surrender and acceptance are based upon the premise that Lurie's acceptance of the surrender of any one of the four lease contracts would constitute acceptance of the surrender of all four of the lease contracts. CSR argues that this result is necessary because the lease contracts do not permit partial termination and because the arrangement of the premises demonstrates that the four lease agreements were intended to make up a single integrated unit.

Unless ambiguity exists, Illinois lease contracts are to be construed "without letting the parties introduce any evidence other than the contract itself." *LaSalle National Bank v. General Mills Restaurant Group, Inc.,* 854 F.2d 1050, 1052 (7th Cir. 1988). *See also Sunstream Jet Express, Inc. v. International Air Service Co.,* 734 F.2d 1258, 1268 (7th Cir.1984) ("[R]ecent Illinois decisional law clearly provides that when interpreting a contract, parol and extrinsic evidence is only admissible at trial, for consideration by the trier of fact, if the trial court determines, as a matter of law, that the contract is 'ambiguous' ") (Overruling *Ortman v. Stanray Corp.,* 437 F.2d 231 (7th Cir.1971)). In the case of an unambiguous contract, the interpretation of the lease is a question of law rather than a question of fact. *See Advertising Checking Bureau, Inc. v. Canal–Randolph Associates,* 101 Ill.App.3d 140, 56 Ill.Dec. 634, 637, 427 N.E.2d 1039, 1042 (1981) ("The interpretation of a lease is a question of law when the terms are plain and unambiguous"). Thus, the interpretation of the lease can only raise a genuine issue of material fact if the lease is ambiguous. *See generally LaSalle National Bank* at 1052 (In the case of an ambiguous lease contract "the question of the meaning of the contract is treated as an ordinary factual question" on which summary judgment is permissible "if no material facts [are] contested").

In this case none of the leases contain language relieving a tenant of obligations in the event the landlord accepts surrender of a different lease in the same building. Further, the only language touching upon the interrelation of the various leases is found in the leases for Suites 1900, 1919 and 1927 which permit the *landlord* the option of terminating a lease by notice to the tenant in the event the tenant defaults on an obligation in another lease. The language of the lease contracts clearly provides no right to a tenant to terminate a lease in the event of a default or acceptance of surrender with respect to another lease. Indeed, the leases' explicit provision of this right only to the landlord appears to even more clearly preclude a conclusion that the leases could afford the tenant a right to terminate in the event of default or the acceptance of surrender of a different lease than would leases silent on this subject.

Because the lease contracts unambiguously afford CSR no relief from rent obligations in the event surrender of another lease agreement is accepted, construction of the leases is a matter of law concerning which extrinsic evidence, such as the arrangement of the various CSR suites, is not relevant. Since the lease contracts plainly provide that acceptance of surrender of one of CSR's leases will not affect obligations under another CSR lease, CSR has failed to raise a genuine issue of material fact with respect to this question.

## B

■ We must next determine if CSR raised a genuine issue of material fact concerning the question of whether Lurie's execution of leases with the Taylor law firm and Prentice Hall constituted an acceptance of CSR's surrender of any of the lease contracts affected by these successor leases.

In Illinois the doctrine of surrender and acceptance is defined, in the context of a lease, as "a set of circumstances under which a court may come to the conclusion that an agreement had been reached whereby the lessee surrendered the premises and the lessor accepted the premises back, both intending thereby to terminate the lease and cancel all the covenants and obligations thereunder." *Solomon v. Geller,* 48 Ill.App.2d 15, 198 N.E.2d 210, 214 (1964). "Whether a surrender and acceptance actually occurred depends upon the intention of the parties," and a "surrender is the yielding up of an estate so that the leasehold interest becomes extinct by mutual agreement." *Peirce v. Conant,* 47 Ill.App.2d 294, 198 N.E.2d 555, 559 (1964) (citations omitted). Although surrender and acceptance is "based essentially on a mutual consent or understanding.... [u]nder certain circumstances it has been held to apply by operation of law." *Solomon,* 198 N.E.2d at 214. Surrender and acceptance by operation of law is "based upon the principles of estoppel and the conduct proved must be such as is inconsistent with the continuance of the relation of landlord and tenant." *Thompson v. Western Casket Co.,* 219 Ill.App. 184, 190 (1920).

The essence of CSR's position is that Lurie's entry into lease agreements with the Taylor law firm and Prentice Hall constituted an immediate acceptance of CSR's proffered surrender of its leases by operation of law. The basis for this claim is that Lurie's entry into these agreements was incompatible with a continued landlord-tenant relationship between Lurie and CSR.

CSR has presented evidence sufficient to support a finding that it surrendered the involved leases. CSR vacated the property before the execution of the Taylor and Prentice Hall leases and certainly had a subjective desire to terminate its rent payments. However, a surrender finding is undercut by the facts that CSR maintained custody of the keys to the premises and participated in attempts to obtain a sublessee. Nonetheless, a reasonable fact-finder could rule that CSR surrendered the leases in question to Lurie prior to Lurie's entry into the Taylor and Prentice Hall leases.

Whether Lurie accepted this surrender is quite another matter. The Taylor lease commenced after the conclusion of CSR's leases with Lurie. The Taylor lease did not prevent CSR from enjoying the entire term of its leases. As the district court persuasively observed in a case in which one learns of a present tenant's intent not to renew its lease: "It is simply good business to sign up future tenants during the tenancy of the present occupants." *Checkers, Simon & Rosner,* slip op. at 5. Thus, a reasonable finder of fact could not conclude that the mere execution of the Taylor lease was inconsistent with the continuation of CSR's obligations under its leases.

Similar difficulties are present with CSR's position that Lurie's entry into the Prentice Hall lease resulted in an immediate acceptance of surrender of CSR's leases. Unlike the Taylor lease, the Prentice Hall lease encompassed a time period which overlapped with the CSR leases. However, until February 15, 1986, CSR enjoyed all the benefits of the lease and Lurie's actions did not reveal any intent on its part to release CSR from the lease's obligations. Only after Prentice Hall's February 15, 1986, occupancy date could there possibly have been the inconsistency between the Prentice Hall and CSR leases necessary to result in acceptance of surrender by operation of law. Thus, we are convinced that a reasonable finder of fact would also not be able to conclude that the mere execution of the Prentice Hall lease resulted in acceptance of surrender of any of the CSR leases. Accordingly, CSR has failed to raise a genuine issue of material fact concerning the questions of whether Lurie's entry into either the Taylor or Pren-

tice Hall leases constituted an acceptance of a surrender of CSR's leases.[7]

C

■ CSR next argues that Lurie accepted the surrender of its leases when it began to remodel for Prentice Hall and the Taylor law firm in February 1986. The parties' rights in this case are controlled by the portions of each lease which specifically provide Lurie with permission "[d]uring the last ninety days of the Term ... to decorate, remodel, repair, alter or otherwise prepare the premises for reoccupancy." CSR does not allege that these provisions are unenforceable. Rather, CSR argues that this language should not control because it was not intended to provide Lurie with a right to make alterations to the premises which were so extensive as to prevent CSR's use of the leasehold.

This argument, however, is directly contrary to the Illinois appellate court decision in *Advertising Checking Bureau v. Canal–Randolph Associates*, 101 Ill.App.3d 140, 56 Ill.Dec. 634, 636–637, 427 N.E.2d 1039, 1041–1042 (1981). In that case a tenant challenged a landlord's alteration of a corridor leading to the tenant's offices. The lease contained a paragraph stating:

"Landlord shall have the right at any time, without the same constituting an eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairs, toilets, or other public parts of the Building."

Because this term of the lease was unambiguous, its construction was a matter of law on which extrinsic evidence was not to be admitted. 56 Ill.Dec. at 637, 427 N.E.2d at 1042. In reaching this conclusion, the *Advertising Checking* court rejected the argument that the possibility of extensive alterations was sufficient to demonstrate ambiguity and permit extrinsic evidence of

the parties' intent to be introduced. The court observed:

"Plaintiff also argues that [the remodeling clause] is ambiguous because it could be construed to allow outlandish modification of the public areas of the building. Plaintiff suggests that the clause could be cited as justification for narrowing the corridor to 1 foot in width. Following the definition quoted above, we believe that the possibility that language may be stretched, with fanciful results, does not indicate ambiguity. If the landlord adopted an unreasonable construction of [the remodeling clause] and attempted such an outrageous modification of the corridor, the result might well amount to a constructive eviction or a destruction of the tenant's easement for ingress and egress. Those misdeeds have their remedies, but the fact that a landlord might attempt misconduct under color of the lease does not make the lease ambiguous."

56 Ill.Dec. at 637, 427 N.E.2d at 1042 (citations omitted).

In the case before us there are also unambiguous lease provisions permitting remodeling. As *Advertising Checking* holds, the possibility of excessive alteration of the premises in the course of this remodeling does not render the language ambiguous. Under Illinois law, construction of the terms of the leases is, thus, a matter of law on which extrinsic evidence of the parties' intent may not be introduced. As the leases explicitly permit remodeling during the final 90 days of CSR's term, Lurie did not act inconsistently with the leases when it altered the premises for the benefit of Taylor and Prentice Hall during this period. Accordingly, CSR has failed to raise a genuine issue of material fact concerning the question of whether Lurie's remodeling of the involved suites constituted an acceptance of surrender of the CSR leases.

D

■ The remaining question is whether Prentice Hall's February 15, 1986, occupa-

---

7. With respect to both the Taylor and Prentice Hall leases, CSR also alleges that the scope of remodeling contemplated by Lurie necessitates a conclusion that Lurie accepted surrender of

CSR's leases on the date it entered into the successor leases. Our decision in Section III–C, *infra*, precludes a ruling in favor of CSR on this basis.

tion of part of Suite 1927 resulted in Lurie's acceptance of CSR's surrender of the lease for this space. The district court's decision must be read as implicitly determining that there was no surrender because it awarded damages to CSR in the amount of $14,593.34, a figure representing the rents received from Prentice Hall during the term of Prentice Hall's lease. The district court appeared to find Section 21(d) of the lease controlling when it determined that Prentice Hall's rents were for the account of CSR. Such a finding relies upon the continued presence of a lease and is inconsistent with a conclusion that there was acceptance of a surrender of the lease on February 15, 1986. Had Lurie accepted surrender of the CSR lease for Suite 1927 on that date, CSR would have been entitled to the entire $33,855.92 rent it paid Lurie under that lease for the period between February 15, 1986, and April 30, 1986.

Section 21(d) of the lease with CSR for Suite 1927 unambiguously provides Lurie with the right to relet part of the premises, without terminating the lease and calls for CSR to pay the difference between the rent received from the new tenant and the rent required of CSR. Although Lurie's attorney indicated that Lurie may not have relied on Section 21(d), the fact remains that Lurie's conduct was generally consistent with the clear provisions of this section. Because a reasonable finder of fact could not determine that Prentice Hall's February 15, 1986, occupancy of Suite 1927 was inconsistent with the terms of the lease between Lurie and CSR, CSR did not raise a genuine issue of material fact concerning the question of whether the lease was surrendered on that date.

Since CSR has failed to present factual allegations sufficient for a reasonable factfinder to conclude that Lurie accepted surrender of any of the leases between Lurie and CSR, no genuine issue of material fact has been raised. The district court properly entered summary judgment entitling Lurie to keep all of CSR's rent payments and awarding CSR the amounts Lurie received from Prentice Hall for Suite 1927 prior to the conclusion of CSR's lease for these premises. The decision of the district court is

AFFIRMED.