**FIRST BANK SOUTHEAST, N.A., a national banking association, formerly known as Kenosha National Bank, Plaintiff–Appellee,**

v.

**PREDCO, INCORPORATED, Defendant–Appellant.**

No. 90–2454.

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1991.

Decided Jan. 15, 1992.

Jonathan A. Mulligan (argued), Ruetz, Davison & Mulligan, Kenosha, Wis., for plaintiff-appellee.

Randall L. Nash (argued), O'Neil Cannon & Hollman, Milwaukee, Wis., for defendant-appellant.

Before COFFEY and MANION, Circuit Judges, and WILL, Senior District Judge.[*]

COFFEY, Circuit Judge.

Predco, Inc. ("Predco"), a New Jersey corporation, appeals from entry of summary judgment in favor of First Bank Southeast, N.A. ("First Bank"), whose principal place of business is in Franksville, Wisconsin. The district court determined that, pursuant to a guaranty agreement between Predco and First Bank, First Bank was entitled to principal and interest on industrial revenue bonds as well as attorneys' and trustee's fees and expenses. We affirm.

## I. FACTUAL BACKGROUND

On June 1, 1978, the City of Wilton, Iowa issued $1,250,000 in industrial development revenue bonds. Plaintiff First Bank acted as trustee for the bond issue. The City of Wilton loaned the proceeds from the sale of the bonds to Precision Steel Company–Iowa, a wholly-owned subsidiary of defendant Predco, to finance the construction of a steel plant in Wilton. Precision Steel Company–Iowa agreed to obligations set forth in the loan agreement including the payment of semi-annual installments on the principal and interest on the bonds and the payment of First Bank's reasonable attorneys' fees in the event of default. Predco entered into a Guaranty Agreement guaranteeing the performance of its subsidiary Precision Steel Company–Iowa pursuant to the Loan Agreement.

Payments on the principal and interest on the bonds were to be made semi-annually from December 1, 1978, until the bonds' maturity, with the maturity dates ranging from June 1, 1981, to June 1, 1993. Precision Steel Company–Iowa began making the required principal and interest payments under the Loan Agreement. Construction of the Wilton manufacturing facility was completed in 1979, and during that same year, Precision Steel Company–Iowa's name was changed to Midwest Precision Steel Co. As part of a 1981 internal restructuring program, Predco formed a wholly-owned subsidiary, Predco Steel Corporation, which became the owner of all the capital stock of Midwest Precision Steel Co. Later in 1981, Predco sold all of the stock of Predco Steel Corporation, including the stock of Midwest Precision Steel Company, to Jones & Laughlin Steel, Incorporated (Jones & Laughlin), which at the time of purchase was a wholly-owned subsidiary of the LTV Corporation ("LTV"). Predco failed to inform First Bank of this sale and there were no changes made in the Guaranty Agreement. As part of the sale, Jones & Laughlin agreed to indemnify Predco for any claim, suit, proceeding or action resulting from Predco's role as guarantor of the bonds. In June 1984, LTV acquired Republic Steel Corporation ("Republic"). In December 1984, Jones & Laughlin merged into Republic, which then changed its name to LTV Steel Company, Inc. ("LTV Steel Company"), a wholly-owned subsidiary of LTV.

---

[*] The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

Payments on the bonds' interest and principal continued to be made through June 1, 1986. These payments resulted in a decrease in bond principal from $1,250,000 to $810,000.[1] On July 17, 1986, because of financial pressure, LTV and its affiliated companies, including LTV Steel Company, filed petitions for reorganization under Chapter 11 of the Bankruptcy Code. After that date no further payments were made on the bonds' principal and interest. Shortly thereafter, First Bank declared a default, accelerated the amount due on the bonds and demanded payment for the full amount of the bonds' principal and interest, as well as attorneys' fees, from both LTV Steel Company and Predco.

First Bank brought this diversity action to recover from Predco, under the Guaranty Agreement, principal and interest due on the bonds as well as attorneys' and trustee's fees and expenses. The trial court entered summary judgment in favor of First Bank for the full amount of principal and interest due on the bonds as well as for $24,049.74 in attorneys' fees, costs and expenses for the enforcement of the Guaranty Agreement. The court requested further briefing on the question of whether First Bank should be awarded attorneys' fees under the Guaranty Agreement for its work in the LTV bankruptcy proceedings. Ultimately, the district court awarded First Bank an additional $86,262.37 in attorneys' fees and expenses and trustee fees and expenses incurred in the LTV bankruptcy reorganization proceedings. The court went on to award First Bank $4,120.11, representing one-quarter of the amount it requested as additional attorneys' fees for enforcing the Guaranty Agreement. Predco appeals.

## II. ISSUES PRESENTED

The question to be determined is whether Predco presented a genuine issue of material fact precluding the trial court from entering summary judgment in favor of First Bank. We make this determination with respect to the following issues: (1) Did the terms of the Guaranty Agreement require Predco to pay the obligations of Precision Steel Company–Iowa and its successors under the Loan Agreement? (2) Did Predco's sale of Predco Steel Co. (which included all of the capital stock of Midwest Precision Steel, formerly known as Precision Steel Company–Iowa) materially alter the Guaranty Agreement, thereby relieving Predco from its responsibilities under the Guaranty Agreement as a matter of law? (3) Did the promises, pursuant to the Guaranty, of payment and actual payment of the bonds by Jones & Laughlin and LTV Steel Company constitute either a satisfaction of Predco's guaranty obligations or a novation that would free Predco from its duties under the Guaranty Agreement? (4) Did First Bank waive its rights to enforce the Guaranty Agreement against Predco? (5) Was First Bank equitably estopped from enforcing the Guaranty Agreement against Predco as a result of conduct that allegedly reasonably induced Predco's reliance on the non-enforcement of the Guaranty Agreement? (6) Was the award of attorneys' and trustee's fees and expenses to First Bank appropriate?

## III. STANDARD OF REVIEW

In addressing the issues raised in this case we must determine whether there existed a genuine issue of material fact precluding a grant of summary judgment in First Bank's favor. "In determining whether a genuine issue of material fact is present we must consider both the substantive law applicable to this case and the question of whether a reasonable jury could render a verdict in favor of the nonmoving party based upon this law." *Checkers, Simon & Rosner v. Lurie Corp.*, 864 F.2d 1338, 1344 (7th Cir.1988) (footnote omitted). We have explained our approach to the question of whether a genuine issue of material fact is present as follows:

"A motion for summary judgment should be granted only where there is no genu-

---

**1.** In 1982, Jones & Laughlin notified First Bank to direct future communications regarding the bond issue to LTV Corporation. In December 1984, First Bank was informed that LTV Steel Corp. would assume all obligations of Jones & Laughlin for the payment of the bonds.

ine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In reviewing a grant of summary judgment, we must view the record and all inferences drawn therefrom in the light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994 [8 L.Ed.2d 176] ... (1962); *Illinois v. Bowen,* 808 F.2d 571, 574 (7th Cir.1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations that there is a *genuine* issue of material fact which requires trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553 [91 L.Ed.2d 265] ... (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510 [91 L.Ed.2d 202] ... (1986)."

*Beard v. Whitley County, REMC,* 840 F.2d 405, 409–10 (7th Cir.1988).

## IV. DUTIES UNDER THE GUARANTY AGREEMENT

■ Under Wisconsin law, applicable to this proceeding under the terms of the Guaranty Agreement,[2] "[i]t is well established that absent ambiguity requiring resort to extrinsic evidence, the construction of a written contract presents a question of law solely for the court's determination." *Jos. P. Jansen Co. v. Milwaukee Area District Board of Vocational, Technical and Adult Education,* 105 Wis.2d 1, 13, 312 N.W.2d 813, 818 (1981). "[T]he language of a contract must be understood to mean what it clearly expresses, and the court may not depart from the plain meaning of a contract when it is free from ambiguities." *In re Alexander,* 75 Wis.2d 168, 181, 248 N.W.2d 475, 483 (1977). The terms of the Guaranty Agreement plainly and unambiguously provide that Predco is responsible for the obligations its subsidiary undertook under the Loan Agreement. Section 2.1 of the Guaranty Agreement establishes an unconditional responsibility for Predco, as guarantor, to guarantee the performance of the Loan Agreement:

"SECTION 2.1. Guarantor [Predco] hereby unconditionally guarantees to Trustee [First Bank] for the benefit of the holders from time to time of the bonds and the interest coupons appertaining thereto the due performance by the Contracting Subsidiary of all of its obligations under the [Loan] Agreement, including the payment under Section 4.2 of the Agreement of sums sufficient for (a) the full and prompt payment of the principal of and premium, if any, on any Bonds when and as the same shall become due, whether at the stated maturity thereof, by acceleration, call for redemption or otherwise, and (b) the full and prompt payment of any interest on any Bond when and as the same shall become due. All payments by Guarantor shall be paid in lawful money of the United States of America. Each and every default under the Agreement shall give rise to a separate cause of action hereunder, and separate suits may be brought hereunder as each cause of action arises."

Section 2.2 of the Guaranty emphasizes the unconditional nature of Predco's obligations by providing that no subsequent event will preclude Predco's liability as Guarantor and lists several specific contingencies that will not excuse Predco's performance:

"SECTION 2.2. The obligations of Guarantor under this Guaranty shall be absolute and unconditional and shall remain in full force and effect until the entire principal of, premium, if any, and interest on the bonds' shall have been paid ... and such obligation shall not be affected, modified or impaired upon the

2. Because "[n]either [party] challenge[s] the district court's determination that [Wisconsin] law governs the interpretation of the ... contract [,] we will apply [Wisconsin] law without independently examining the choice of law issue." *Corrugated Paper Products, Inc. v. Longview Fibre Co.,* 868 F.2d 908, 910 n. 2 (7th Cir.1989). *See also Runnemede Owners, Inc. v. Crest Mortgage Corp.,* 861 F.2d 1053, 1056 (7th Cir.1988) ("The litigants have not contested the trial court's application of Illinois law, thus, we apply Illinois law.")

happening from time to time of any event, including without limitation any of the following, whether or not with notice to, or the consent of, Guarantor:

\* \* \* \* \* \*

(d) the waiver of the payment, performance or observance by Issuer [Wilton] or Guarantor, or its Contracting Subsidiary, of any of the obligations, covenants or agreements of any of them contained in the Indenture, the [Loan] Agreement or this Guaranty;

\* \* \* \* \* \*

(f) the modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in the Indenture or the [Loan] Agreement;

(g) the taking, suffering or omitting to take any of the actions referred to in the Indenture or the [Loan] Agreement and any actions under this Guaranty;

(h) any failure, omission, delay or lack on the part of Trustee or Issuer or its assignee to enforce, assert or exercise any right, power or remedy conferred on Trustee [First Bank] in this Guaranty or on Trustee or Issuer under the Indenture or the [Loan] Agreement, or any other act or acts on the part of Issuer, Trustee or any of the holders from time to time of the bonds or of the interest coupons appertaining thereto;

(i) the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, as-

signment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting Guarantor or its Contracting Subsidiary, Issuer or Trustee or any of the assets of any of them, or any allegation or contest of the validity of this Guaranty or the [Loan] Agreement in any such proceeding;

·(j) the release or discharge of Guarantor or its Contracting Subsidiary from the performance or observance of any obligation, covenant or agreement contained in the [Loan] Agreement by operation of law;

(k) to the extent permitted by law, the release or discharge of Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty by operation of law;

(*l*) the default or failure of Guarantor or its Contracting Subsidiary fully to perform any of its obligations set forth in this Guaranty or in the [Loan] Agreement...."

We emphasize here that Section 2.2(i) clearly provides that a sale of the contracting subsidiary, such as occurred in this case, does not release Predco from its obligations as guarantor. Furthermore, Predco waived any defense to its performance as guarantor.[3] In addition, Predco agreed to permit First Bank to proceed against Predco under the Guaranty without resort to other remedies or security,[4] and to waive notice of First Bank's intent to rely on the Guaranty.[5] The provisions of the Guaran-

---

3. Section 2.3 of the Guaranty Agreement provides that:

"SECTION 2.3. No set-off, counterclaim, reduction, or diminution of any obligation, or any defense of any kind or nature which Guarantor has or may have against Trustee shall be available hereunder to Guarantor against Trustee."

4. Section 2.4 of the Guaranty Agreement provides that:

"SECTION 2.4. Upon the occurrence of an 'event of default' under the [Loan] Agreement, Trustee [First Bank] may, and if requested to do so by the holders of 25% in aggregate principal amount of the Bonds then outstand-

ing, and upon indemnification as hereinafter provided, shall be obligated to proceed hereunder and Trustee, in its sole discretion, shall have the right to proceed first directly against Guarantor under this Guaranty without proceeding against or exhausting any other remedies which it may have and without resorting to any other security held by Issuer or Trustee...."

5. Section 2.5 of the Guaranty Agreement provides in relevant part:

"Guarantor hereby expressly waives notice from Trustee or the holders from time to time of any of the Bonds or of the interest coupons appertaining thereto of their acceptance and reliance on this Guaranty."

ty Agreement set forth above certainly establish, as a matter of law, that Predco remained liable as guarantor under the Guaranty Agreement despite the occurrence of events such as the sale of its contracting subsidiary, the assumption of any of the subsidiary's loan obligations by another company or the failure of First Bank to notify Predco of its intent to continue to rely upon Predco as guarantor.

In order to avoid the effect of this seemingly clear contract language, Predco asserts that there exist ambiguities in the Guaranty Agreement that result in genuine issues of material fact concerning whether Predco remains bound under the terms of the guaranty. *See Pleasure Time, Inc. v. Kuss,* 78 Wis.2d 373, 379, 254 N.W.2d 463, 467 (1977) ("[I]n a case of ambiguity in a written contract where words or terms are to be construed by extrinsic evidence, then the question [of contract construction] is one for the trier of fact.") Predco contends that the definition of "contracting subsidiary" in the Guaranty Agreement is ambiguous in that it does not clearly include Precision Steel Company–Iowa's successors or assigns. We disagree. In the initial section of the Guaranty Agreement, where Precision Steel Company–Iowa is designated as the "Contracting Subsidiary," it is evident that the proceeds from the bonds were intended for the use of Precision Steel Company–Iowa and its assigns.[6] Even more support for a conclusion of lack of ambiguity is found in Section 2.2(i), quoted above, which provides that the "sale or other disposition of all or substantially all the assets" of the contracting subsidiary will not affect the validity of the Guaranty Agreement. Thus, Predco's sale of its subsidiary did not raise any ambiguities concerning Predco's duties under the Guaranty Agreement.

Predco also believes that the Guaranty Agreement is ambiguous on the question of whether Predco remained bound when a new principal began to make payments under the Loan Agreement. We disagree. The Guarantee Agreement is not ambiguous. Predco ceased making payments on the bond obligations when it sold its interest in 1981 in the Loan Agreement principal, Precision Steel Company–Iowa (renamed Midwest Precision Steel Co. in 1981). Midwest Precision's new owners, Jones & Laughlin, a subsidiary of the LTV Corporation, began to make payments under the Loan Agreement. In December 1984, LTV Steel Company, the successor to Jones & Laughlin, assumed all obligations of Jones & Laughlin under the Loan Agreement. Thus, Predco ceased making payments under the Loan Agreement because it sold its interest in the principal. However, this sale did not extinguish Predco's responsibilities under the Guaranty Agreement. Precision Steel Company–Iowa, although part of a new corporation after its sale by Predco, was continuing to perform its obligations as the contracting subsidiary under the Loan Agreement. Because the Guaranty Agreement unambiguously obligated Predco as Guarantor, even if Precision Steel Company–Iowa was sold or if another entity assumed the loan obligations, the trial court properly held, as a matter of law, that Predco was bound to its duties as Guarantor under the express language of this agreement.

## V. MATERIAL ALTERATION OF THE GUARANTY

■ Predco also asserts that material alterations in the scope of the Guaranty Agreement released Predco from its obligations under the Agreement by operation of law. Predco contends that a number of events, including the sale of Predco Steel Corp. to Jones & Laughlin, the subsequent merger of Jones & Laughlin and Republic Steel, the closing of the Wilton plant, and Predco's failure to continue to purchase insurance for that plant materially altered

---

6. The paragraph provides:
 "WHEREAS, the proceeds derived from the issuance of the Bonds are to be applied to the payment of costs of certain manufacturing facilities (the 'Project') for the benefit of Guarantor, for use by Precision Steel Company–Iowa, an Iowa corporation, one of Guarantor's wholly-owned subsidiaries ['Contracting Subsidiary'], and its assigns...."

the Guaranty and released Predco from its responsibilities.

In *United States Shoe Corp. v. Hackett,* 793 F.2d 161 (7th Cir.1986), we considered the issue of material alteration of a guaranty agreement under Wisconsin law. We recognized that:

"The proposition that a significant increase in risk discharges a guaranty is established in Wisconsin.

. . . . .

The principle that a big increase in risk discharges the guarantor is an implication of the fact that a guaranty is a commercial contract. The guarantor takes a risk in exchange for a benefit.... Unless the guarantor can estimate the size of the risk, he cannot tell whether the return is worthwhile. When events beyond the guarantor's control dramatically increase the risk, the assumptions on which the contract was founded are undercut. Usually a change in the terms of trade does not discharge a contract; an increase in the market price of coal does not relieve a seller of making deliveries contracted for at a lower price; the risk of a change in price influences the price fixed in the contract and the contract apportions risk.... The principle that a substantial increase in risk avoids the guaranty rests on the assumption that guarantors would not ordinarily tolerate a big increase in the risk they face without seeking something in return....

Thus a full statement of the rule is that 'a material alteration in the contract between the creditor and the principal made after the execution of the Guaranty Agreement and without the consent of the guarantor discharges the guarantor.' *FDIC v. Manion,* 712 F.2d 295, 297 (7th Cir.1983); *accord, Lake Shore Commercial Finance Corp. v. Drobac,* 107 Wis.2d 445, 447, 319 N.W.2d 839, 840 (1982); *Morley–Murphy Co. v. Van Vreede,* 223 Wis. 1, 7, 269 N.W. 664, 666 (1936).

A guarantor may consent to the increased risk if he knows of the risk and proceeds heedless of it. Closer to the point, a guarantor may consent to the increased risk by creating it." *Hackett,* 793 F.2d at 162–63.

In the instant case, each of the increased risks Predco contends materially altered the contract arose as a direct consequence of Predco's decision to sell Predco Steel Corp. without notifying First Bank. It is Predco that created the heightened vulnerability it claims materially altered the Guaranty. Under these conditions, Predco cannot claim that events beyond its control materially altered its risk under the Guaranty Agreement. Thus, a reasonable finder of fact could only determine that material alteration of risk does not provide a basis for releasing Predco from its duties under the Guaranty Agreement.

## VI. RELEASE FROM THE GUARANTY AGREEMENT BASED UPON SUBSTITUTION OF SUCCESSOR COMPANIES UNDER THE LOAN AGREEMENT AND NOVATION

■ Predco argues that the sale of Predco Steel Corp. to Jones & Laughlin and Jones & Laughlin's alleged promise to pay Predco Steel Corp.'s debt satisfied Precision Steel Company–Iowa's obligations under the Loan Agreement, thereby discharging Predco from its duties under the Guaranty Agreement. Predco further contends that the substitution of Jones & Laughlin for Precision Steel Company–Iowa as the debtor under the Loan Agreement constituted a novation releasing Predco from any duties under the Guaranty Agreement.

Predco cites our decision in *Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 942–43 (7th Cir.1982) as the principal authority for its argument that Jones & Laughlin's alleged promise to pay Precision Steel Company–Iowa's obligations under the Loan Agreement released Predco from its obligations under the Guaranty Agreement. In *Central Soya* the issue was whether a promise to drop a $65,000 counterclaim in litigation was sufficient to satisfy a $24,000 debt the counterclaimant owed to the plaintiff. *Central Soya's* rationale cannot control this case because any

promise Jones & Laughlin may have made to pay Precision Steel's obligations under the Loan Agreement is not the monetary equivalent of a present satisfaction of this debt. This proposition is illustrated by the facts of the instant case, where the LTV bankruptcy precluded full satisfaction by Jones & Laughlin and its successors of the debt under the Loan Agreement. Thus, a reasonable fact finder would necessarily conclude that any promise to pay the loan made by Jones & Laughlin failed to satisfy the underlying debt and did not release Predco from the terms of the Guaranty Agreement.

■ Predco, in its novation argument, asserts that First Bank's acceptance of payments under the Loan Agreement from Jones & Laughlin coupled with First Bank's failure to act in a manner demonstrating that it would require Predco to honor its guaranty obligations constituted the bank's agreement to release Predco from its obligations. There are several problems with Predco's argument. Initially, First Bank never specifically agreed to an alteration of the Guaranty Agreement. Furthermore, the conduct Predco claims is evidence of the novation is entirely consistent with the terms of the Guaranty Agreement. The Guaranty Agreement makes plain that Predco's obligations are not discharged by a sale of Precision Steel Company–Iowa, see Guaranty Section 2.2(i), by First Bank's failure to exercise any right provided under the Guaranty or the Loan Agreement, see Section 2.2(h), by First Bank's waiver of any of the obligations of Precision Steel, see Section 2.2(d) or by the modification or amendment of any obligation contained in the Loan Agreement. See Section 2.2(f). First Bank was entitled to proceed in a manner in accordance with the terms of its written Guaranty Agreement with Predco and its conduct can not be considered to have abrogated the terms of this agreement. No new Guaranty Agreement was created either as a result of an explicit agreement between Predco

and First Bank or through First Bank's conduct.

## VII. WAIVER

■ Predco also claims that First Bank's failure to assert its rights under the Guaranty Agreement for a period of several years resulted in a waiver of First Bank's right to rely upon the agreement. Specifically, Predco contends that the Bank's failure to request a financial statement from Predco for five and one half years prior to its enforcement of the Guaranty Agreement constituted a waiver of its right to rely upon the Guaranty Agreement's terms.

The first major difficulty with Predco's argument is that Section 5.2 of the Guaranty Agreement explicitly provides, in relevant part, that: "No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing, but solely by an instrument in writing duly executed by Trustee." Because Predco's claim of waiver is explicitly founded upon First Bank's course of dealing, rather than First Bank's written agreement to release Predco from the Guaranty, the Guaranty Agreement appears to preclude Predco's waiver claim.[7]

Even if Predco's waiver argument were consistent with the terms of Section 5.2 of the Guaranty Agreement, Predco would still be required to demonstrate that First Bank's conduct constituted a waiver of the bank's rights under the Guaranty Agreement. First Bank, however, did nothing inconsistent with the preservation of its right to enforce the Guaranty Agreement. First Bank's utilization of the Guaranty Agreement was not conditioned upon any obligation to notify Predco that the bank intended to enforce the agreement. Indeed, in Section 2.5 of the Guaranty Agreement, Predco explicitly covenanted that: "Guarantor hereby expressly waives notice from Trustee [First Bank] or the holders from time to time of the Bonds or of the interest coupons or appertaining thereto of

---

7. While Predco contends that parties may not prevent oral modifications of written agreements, Predco's argument is inapposite because there was neither an oral nor written agreement on the bank's part to modify the Guaranty Agreement.

their acceptance and reliance on this Guaranty." The Guaranty Agreement unconditionally bound Predco as guarantor, without regard to whether Predco received requests for financial statements or any other notification that First Bank intended to hold Predco to its agreement. Thus, First Bank had every right to expect and to require that Predco live up to its obligations under the Guaranty Agreement. A reasonable fact finder, after consideration of the facts and the law applicable thereto, could only come to the conclusion that First Bank did not waive its right to enforce the Guaranty Agreement against Predco.

## VIII. EQUITABLE ESTOPPEL

■ Predco contends that First Bank should be estopped from enforcing the Guaranty Agreement because Predco relied to its detriment on conduct of First Bank that allegedly reflected an intent to release Predco from its duties under the Guaranty Agreement. First Bank's actions which allegedly prompted Predco's detrimental reliance consisted of: the bank's failure to contact Predco or to request a financial statement; two communications from the bank's counsel with bondholders to the effect that the bank had done everything it could to protect the bondholders' interest even though it had not sought to enforce the Guaranty Agreement; an internal memorandum of Jones & Laughlin's counsel stating that Jones & Laughlin would become the guarantor of the obligation; and letters sent from the LTV Corporation to First Bank indicating that LTV was providing financial statements under the Guaranty Agreement. Predco's alleged detrimental reliance consisted of its failure to disclose on its audited financial statements its liability under the Guaranty Agreement, its failure to purchase insurance for the Wilton plant and its reliance on others to operate the facility.

In order to establish equitable estoppel, the Wisconsin Supreme Court has recognized that "[t]hree facts must be present: (1) *Action* or *nonaction* which induces; (2) *reliance* by another; (3) to his *detriment.*... *Bank of Sun Prairie v. Op-*

*stein,* 86 Wis.2d 669, 680, 273 N.W.2d 279, 284 (1979)." *Consumer's Co–Op v. Olsen,* 142 Wis.2d 465, 493, 419 N.W.2d 211, 221 (1988) (emphasis in original) (citation omitted). "Moreover, the reliance established in support of equitable estoppel must be reasonable." *Id.*

Predco's estoppel argument suffers from the same defect as its waiver contention, that is in order to establish equitable estoppel it is essential that Predco's actions were reasonable when it relied on conduct reflecting First Bank's alleged intent to release Predco from the Guaranty Agreement's obligations. But, as set out in our discussion of waiver in Section VII, *supra,* First Bank's actions were entirely consistent with an intent to enforce the Guaranty Agreement against Predco. Any detrimental reliance on Predco's part that might have been induced by the bank's conduct was unreasonable. Thus, no genuine issue of material fact was raised with respect to Predco's equitable estoppel defense.

## IX. ATTORNEYS' FEES

■ Predco asserts that the Guaranty Agreement does not entitle First Bank to attorneys' fees for First Bank's work in the LTV bankruptcy proceedings or to trustee's fees for its work as trustee under the Bond issue.

Predco claims that the terms of the Guaranty Agreement only provide for payment of attorneys' fees for enforcement of the Guaranty Agreement and do not permit an award for fees incurred in the bankruptcy proceedings. Predco cites Section 2.5 of the Guaranty Agreement that provides, in relevant part: "Guarantor agrees to pay all costs, expenses and fees, including all reasonable attorneys' fees, which may be incurred by Trustee in enforcing or attempting to enforce this guaranty following any default on the part of Guarantor hereunder, whether the same shall be enforced by suit or otherwise." However, Predco fails to note that the Guaranty Agreement also provides that Predco has the duty to pay all the obligations of the Contracting Subsidi-

ary under the Loan Agreement.[8] One of the substantive obligations under the Loan Agreement is to pay reasonable attorneys' fees and other expenses incurred in the collection of payments due under the Loan Agreement.[9] The attorneys' fees attributable to the bankruptcy proceedings were part of an attempt to satisfy the debt incurred under the Loan Agreement and are amounts due under the Loan Agreement and guaranteed by Predco under the Guaranty Agreement. Thus, the Guaranty Agreement does, in fact, require Predco to pay reasonable attorneys' fees incurred in the LTV bankruptcy proceeding.[10]

Predco sets forth several additional reasons why it should not be required to pay the attorneys' fees incurred in the bankruptcy proceedings. Initially, Predco contends that First Bank was unable to recover any money in the bankruptcy proceedings and Predco should not be required to pay attorneys' fees for unproductive litigation. The Guaranty and Loan Agreements did not require that First Bank succeed in collecting money in a proceeding in order for attorneys' fees to be payable. Furthermore, had First Bank been successful in the bankruptcy proceedings, Predco would have benefitted because its obligations under the Guaranty Agreement would have been reduced by the amount the bank would have been able to recover in the bankruptcy proceedings.

Predco goes on to argue that First Bank should not recover fees for the bankruptcy proceeding because it played a minor role in the LTV bankruptcy litigation. Again, there is nothing in either the Guaranty Agreement or the Loan Agreement that would limit recovery of attorneys' fees for this work based upon First Bank's small role in the overall bankruptcy proceeding.

Predco also claims that the criteria utilized in the bankruptcy court's attorneys' fees awards should be applied to deny any recovery. Again, there is nothing in the Guaranty or Loan Agreements limiting recovery of attorneys' fees to cases in which a bankruptcy court would have awarded fees.

▪ Predco asserts that the amount of fees the district court awarded was "unreasonable." It further contends that the attorneys' fees for reviewing bankruptcy proceeding documents and expenses for travel to creditor meetings were excessive. First Bank requested and was awarded attorneys' fees for "778.4 hours of representation totaling $62,778 in fees, calculating rates for attorneys and legal assistants ranging between $40 and $90." *First Bank Southeast, N.A. v. Predco, Inc.*, 744 F.Supp. 873, 875 (E.D.Wis.1990). Furthermore, Predco sought and received $21,-338.23 in expenses. *Id.* The trial court examined the attorneys' fees and expenses claims and found that "the hourly rates charged by each attorney and legal assistant, the total time spent, and the expenses incurred fall within a reasonable range for attorneys rendering this type of counsel."

---

**8.** Section 2.1 of the Guaranty provides, in relevant part:

"Guarantor hereby unconditionally guarantees to Trustee for the benefit of the holders from time to time of the Bonds and the interest coupons appertaining thereto the due performance by the Contracting Subsidiary of *all of its obligations under the [Loan] Agreement....*"
(Emphasis added).

**9.** Section 6.3 of the Loan Agreement provides:

"SECTION 6.3 AGREEMENT TO PAY ATTORNEYS' FEES AND EXPENSES. In the event the Company should default under any of the provisions of this Agreement and the Issuer or the Trustee should employ attorneys or incur other expenses for the collection of the payments due under this Agreement or the enforcement of performance or observance of any obligation or agreement on the part of the Company herein contained, the Company agrees that it will on demand therefor pay to the Issuer or the Trustee the reasonable fees of such attorneys and such other expenses so incurred by the Issuer or the Trustee."

**10.** Requiring Predco to pay these fees is not unfair because Predco is, at least in part, responsible for the expenditure of fees in the bankruptcy proceedings since, as the district court noted, if Predco "had complied originally with its legal obligations under the guaranty, the bondholders may have been paid in full and plaintiff may not have had to continue its participation in the bankruptcy proceedings." *First Bank Southeast, N.A. v. Predco, Inc.*, 744 F.Supp. 873, 875 (E.D.Wis.1990).

The court went on to find: "Evaluating the responsibility of an indentured trustee in bankruptcy reorganization proceedings against plaintiff's counsel's assertions of its activities on behalf of plaintiff, this Court concludes that the asserted figures for attorneys' fees and costs in the area of the reorganization proceedings ... are reasonable." *Id.* at 875–76. We are convinced by the district court's analysis of the attorneys' fees and costs issue and agree with its conclusion that the amount of fees First Bank incurred in the complex LTV bankruptcy proceedings was reasonable.

 Finally, Predco claims that the district court's $2,146.14 award for trustee's fees, administrative time and mail charges was not authorized by the Guaranty Agreement and unreasonable. Predco's assertion that it is not responsible for trustee's fees and expenses is erroneous. As noted above, Predco guaranteed all obligations under the Loan Agreement. Section 4.2(b) of the Loan Agreement provides that Precision Steel "agrees to pay to the Trustee until the principal of, premium, if any, and interest on all outstanding Bonds shall have been fully paid, from time to time as billed, all reasonable and necessary fees and expenses of the Trustee and any paying agent not theretofore provided for." Further, there is nothing to demonstrate that the $125 per quarter fees of the trustee or its additional hourly fees and expenses were unreasonable. Thus, the trial court's award of trustee's fees and expenses was proper.

 First Bank also asserts on appeal that since Predco concedes that the Guaranty Agreement provides that First Bank is entitled to the payment of all reasonable attorneys' fees and expenses incurred in enforcing the Guaranty, this court should order the district court to calculate First Bank's expenses for this appeal and order Predco to pay First Bank that amount. We agree. This appeal is an effort by the trustee, First Bank, to enforce the Guaranty Agreement and under section 2.5 of that Agreement First Bank is entitled to reimbursement of its reasonable expenses.

## X. CONCLUSION

Because Predco failed to present a question of material fact precluding summary judgment in favor of First Bank and because First Bank was entitled to judgment as a matter of law, the district court's entry of summary judgment in favor of First Bank and its award of attorneys' and trustee's fees and expenses are affirmed. We remand to the district court for its determination of reasonable attorneys' fees and expenses incurred by First Bank in defending this appeal.

AFFIRMED.